**This order is SIGNED.**

**Dated: December 16, 2021**



**JOEL T. MARKER**
**U.S. Bankruptcy Judge**

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>DANNY ZURIEL PACHECO and<br>KELLYANN F. PACHECO,<br><br>          Debtors. | Bankruptcy Case No. 19-22473<br><br>Chapter 7 |
| YAPING LIN *aka* Enya Lin,<br><br>          Plaintiff,<br><br>v.<br><br>DANNY ZURIEL PACHECO,<br><br>          Defendant. | Adversary Proceeding No. 19-2076<br><br>Judge Joel T. Marker |

### MEMORANDUM DECISION

Danny Pacheco was in a bind with his fledgling house-flipping business. Needing a loan of at least $100,000 within five days to close on the purchase of a house, he sent out a call on Facebook, and he received the self-described "answer of [his] prayers" in the form of Allen and Yaping "Enya" Lin. Within 96 hours of first contact between Danny and Allen, Enya wired $100,000 to an Arizona title company followed by another $85,000 to a North Carolina law firm just 15 days later. Two houses were purchased—one in Phoenix and one in Raleigh—and the

1

house in Raleigh was significantly rehabilitated, but ultimately both houses were lost to foreclosure, and the former joint venturers now find themselves as the plaintiff and defendant in this nondischargeability action under § 523(a)(2)(A) and (a)(4) of the Bankruptcy Code.[1]  The Court conducted a two-day trial on December 1 and 2, 2021 and took the matter under advisement.  After considering the evidence properly before the Court, assessing the credibility of the four witnesses,[2] considering the arguments of counsel, and conducting an independent review of applicable law, the Court issues the following Memorandum Decision to explain why Danny's debt to Enya will be discharged.[3]

## I. BACKGROUND / FACTS

First, some background is appropriate.  The process of getting to trial in this adversary proceeding was arduous, and the Court incorporates the records from all eight prior hearings and conferences into this Memorandum Decision.  The Court also takes judicial notice of all the filings in both the main bankruptcy case and this adversary proceeding.  To summarize, the adversary proceeding began as a complaint filed by Allen and Enya Lin against Danny and Kellyann Pacheco asserting claims under § 523(a)(2)(A) for false pretenses, false representations, or actual fraud and under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity.  At a January 23, 2020 hearing on the Pachecos' motion to dismiss, the Court dismissed Kellyann as a defendant with the tacit consent of the Lins' counsel and dismissed

---

[1] All statutory references are to title 11 of the United States Code unless otherwise indicated.

[2] The Court found all four witnesses to be generally credible despite inevitable discrepancies in their testimonies and some obvious frustration or discomfort on the stand, some of which was clearly due to language issues and/or the structure of certain questions that were asked.

[3] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.  Any of the findings of fact herein are also deemed to be conclusions of law, and any conclusions of law herein are also deemed to be findings of fact, and they shall be equally binding as both.

Allen as a plaintiff with the explicit consent of the Lins' counsel.[4]  Enya then filed an amended complaint asserting the same two basic claims for relief but limiting her § 523(a)(2)(A) claim to false representations and switching her § 523(a)(4) claim from fraud or defalcation while acting in a fiduciary capacity to embezzlement.[5]  Danny filed an answer to the amended complaint on March 5, 2020.[6]

Thereafter, the record reflects discovery disputes, several status and final pretrial conferences, a failed mediation, and another motion to dismiss by Danny.  Enya has employed five different attorneys or law firms to represent her since this adversary proceeding was commenced and also spent most of 2021 representing herself.  English is not the native language of either Danny or the Lins.  The Lins live in Arizona, while Danny recently moved from Utah to North Carolina.  And the introduction of COVID-19 into the mix made this already difficult and contentious action even worse.  Given these circumstances and the obvious impossibility of crafting a meaningful pretrial order without essentially trying the matter in a piecemeal fashion, the Court took the uncommon step of dispensing with a pretrial order and heading straight to trial with a defined universe of potential witnesses and exhibits.[7]

With this context in mind, on to the facts and a trial record that has its own difficulties, confusion, and lack of clarity, all of which begin almost immediately.  Danny owned a Wyoming corporation named Flip2Freedom Investments, Inc. (Flip2Freedom) that was created around August 23, 2016 to run a nascent house-flipping business and that owned at least seven subsidiary LLCs at one point or another before the Pachecos filed for chapter 7 bankruptcy on

---

[4] Docket #17.
[5] Docket #18.
[6] Docket #19.
[7] *See, e.g.*, docket #s 69 and 76.  At the last minute, Enya obtained her fourth and fifth attorneys to assist her with the trial, but by that point, the die had already been cast, and the Court did not believe that it would be either useful or appropriate to start from scratch in the crafting of a pretrial order.

April 10, 2019.[8]  Before Danny met the Lins, Flip2Freedom had successfully completed two relatively modest flipping projects in Maryland with rehabilitation costs between $50,000 and $60,000 using the 414 Washington, LLC and 233 Bynum, LLC entities.[9]

On Thursday, July 6, 2017, Danny posted a message in a Facebook group called Private Lender/Investor Network (USA/Canada Only) that stated as follows: "Hello everyone, I need a loan in 5 days.  HML is lending only 90% of $700,000 purchase price.  I at least need $100,000 yo [sic] close on this deal.  Please email me at realestate@flip2freedominvestments.com If [sic] you can fund/lend."[10]  Later that same day, Allen sent a direct message to Danny expressing interest in the deal and a request to call Danny.[11]  Based on the purchase price and the amount needed to close, it appears that Danny's original post refers to the house on 4020 E. Colter Street in Phoenix that was eventually purchased by Danny's entity 4020 Colter, LLC—but other testimony and documents indicate that Danny and Allen initially discussed the house on 1304 Dixie Trail in Raleigh that was eventually purchased by Danny's entity 1034 Dixie, LLC.[12]  In any event, by Saturday, July 8, the Phoenix property had been rolled into the lending discussions.[13]

In a flurry of activity between July 6 and July 10, Danny exchanged several emails and had one or more phone and/or Skype calls with Allen and/or Enya to discuss the Phoenix and

---

[8] Exhibit 9, p. 7 of 79, Schedule A/B Q#19 and p. 71 of 79, Statement of Financial Affairs Q#27.

[9] December 1 Hearing Recording at 2:51:06-2:51:34 PM and December 2 Hearing Recording at 3:14:10-3:14:48 PM.  The exhibits also contain references to gap funding on another unspecified flip (Exhibit 1, p. 5 and Exhibit 2, p. 4) and potentially other recent or concurrent transactions (Exhibit 7, pp. 2-3, email from July 8, 2017 at 2:00 p.m.), but these were not developed at trial.

[10] Exhibit A, p. 1.

[11] *Id.* at p. 5.

[12] *See, e.g.*, Exhibit 7, p. 1 and Exhibit B (July 6, 2017 email exchange regarding Raleigh property); *see also* FN 38 *infra*.  Although the address of the Raleigh property is 1304 Dixie Trail, its corresponding LLC was mistakenly named 1034 Dixie, LLC.  Also, the Court refers to "Danny's entities" throughout this Memorandum Decision solely for the sake of clarity and with the understanding that Danny only directly owns Flip2Freedom, which in turn owns the subsidiary LLCs.

[13] *See, e.g.*, Exhibits C and 7 (pp. 2-3).

Raleigh projects with the understanding that Allen would be the counterparty to the deals with

Danny's entities.[14] Danny was initially looking for a six-month loan but ultimately agreed to the

request for a three-month loan with a corresponding reduction of the promised return on

investment from 25% to 15%.[15] And on Monday, July 10, Enya wired $100,000 to Driggs Title

Agency, Inc. from a joint bank account with Allen as part of the purchase price for the Phoenix

property.[16] By the time of this first wire transfer, the Lins had not met Danny in person despite

some initial discussions about doing so,[17] had not visited the Phoenix property despite living in

the area,[18] and had not requested or reviewed any kind of financial statements from Danny

himself.[19] In addition, Danny and the Lins all have post-secondary degrees in disparate fields

from universities in either the United States or Taiwan, and at some point Enya attended some

free real estate investment seminars, but this was the Lins' first real estate investment transaction

of any kind since moving to the United States in 2014.[20]

Allen made some changes to the draft Real Estate Joint Venture Agreements (JVAs) and

Promissory Notes from Danny, and the Lins also requested a Personal Guarantee, but the final

form of those documents leaves a lot to be desired.[21] For starters, the names of Danny's entities

---

[14] *See generally* Exhibits 7 (pp. 1-9), B, C, and F.

[15] *See, e.g.*, Exhibit B (email from July 6, 2017 at 8:59 PM).

[16] Exhibit 7 (pp. 10-12) and Exhibit J. Exhibit J is only an estimated settlement statement for the Phoenix property which says that $100,000 would be coming from Flip2Freedom Investments, LLC, but Enya's counsel stipulated at trial that both the Phoenix and Raleigh wire transfers went directly to the respective properties' closing agents.

[17] Exhibit B (email from July 6, 2017 at 9:34 PM). In fact, this same email indicates that the Lins were prepared to wire $85,000 for the Raleigh house within 24 hours of Allen's first contact with Danny if he would fly to Arizona and accompany Enya to the nearest bank branch.

[18] December 2 Hearing Recording at 11:46:53-11:47:57 AM. Allen apparently did visit both properties at some point after the loans had already been made.

[19] *Id*. at 11:14:06-11:15:47 AM.

[20] December 1 Hearing Recording at 4:14:54-4:16:03 PM; December 2 Hearing Recording at 11:16:32-11:18:30 AM and 12:27:14-12:30:15 PM. It is unclear if Enya attended the seminars before or after her July 2017 deals with Danny.

[21] Exhibits D, E, 3, 4, 5, and 6. In his testimony, Danny referred several times to Anderson Advisors in Nevada as the provider of document drafting and other services related to his house-flipping business, but

and the names of the joint ventures are identical—4020 Colter, LLC and 1034 Dixie, LLC. Paragraph 4 of the JVAs uses the phrase "with the written consent of PARTY A" instead of "without the written consent of PARTY A." Paragraph 10.e. of the JVAs references an Exhibit C repair budget that is not attached and may not exist, and no Exhibits A or B are attached either.[22] The Promissory Note for the Raleigh property is ostensibly governed by Arizona law while the corresponding JVA is governed by North Carolina law. And the Personal Guarantee, which only appears to cover the $100,000 Phoenix property loan, lists Danny as both the Debtor and the Guarantor with Allen as the Lender.

Danny finally met the Lins in person in Arizona on or about July 20, 2017, but because of Allen's unavailability to join Danny at the UPS Store to sign and notarize the documents, the Lins decided at the last minute to switch the counterparty on the Phoenix JVA and Promissory Note (but not the Personal Guarantee) from Allen to Enya.[23] After that occurred, Enya and Danny signed the Phoenix JVA and Promissory Note on July 21 and had the documents notarized by the same person.[24] For some reason, the Raleigh JVA and Promissory Note— which also now had Enya as the counterparty— were not signed until July 24, and they were notarized by different people because Danny was already back in Utah by that point.[25] Even more curious given Danny's initial rush for funding, the purchase of the Raleigh property did not

---

the full scope and nature of their work was not developed. The parties did not highlight the alleged changes to the draft documents, but Enya testified about the payment of legal fees and the provision of a guarantee. *See, e.g.*, December 2 Hearing Recording at 12:31:07-12:31:48 PM. And Deeds of Trust were also drafted and allegedly changed, but Enya dropped all issues regarding the Deeds of Trust at trial. December 1 Hearing Recording at 4:10:15-4:11:52 PM.

[22] There was some discussion at trial regarding the connection between the rehabilitation budgets in the investment packages (Exhibits 1 and 2) and the references to Exhibit C in the JVAs (Exhibits 3 and 4). *See generally* December 1 Hearing Recording at 3:30:21-3:41:43 PM.

[23] December 1 Hearing Recording at 3:45:16-3:46:46 PM.

[24] Exhibits 3 and 5 (pp. 3-4).

[25] Exhibits 4 and 5 (pp. 1-2).

actually close until July 25—the same day that Enya wired $85,000 to closing agent AW Morris Law, PLLC—and the purchase of the Phoenix property did not close until August 4.[26]

Enya testified at length that essentially every term of the investment packages, the JVAs, the Promissory Notes, and the Personal Guarantee was "very important" to her in agreeing to loan money—including but not limited to the three-month repayment window, the requirement to avoid commingling of funds, the requirement to obtain her permission before refinancing or encumbering the properties, other limitations on management of the joint venture, and the existence of an enforceable guarantee.[27]  Allen likewise testified about the importance of proper financial and project management, separate bank accounts, and the like.[28]  But if anything was crystal clear from the muddled evidence at trial, it was that the Lins' sole focus was on getting repaid with a 15% return within 90 days, with no real interest in or understanding of how that would occur.

Enya wired the first $100,000 well before the JVAs and Promissory Notes were even executed.  Allen testified that he initially trusted Danny because Danny was wearing a suit in his Facebook picture, represented himself as a member of the LDS Church, and "seem[ed] to know what he's doing" despite having only two prior successful flips under his belt.[29]  Allen also testified that he did not understand real estate "gap funding" when he first interacted with Danny and that "we [didn't] really care about" whether the properties were rehabilitated or sold to somebody else or disposed in some other way.[30]  Enya testified that she saw no need to review any financial information from Danny because he would not have been asking for a loan if he

---

[26] December 2 Hearing Recording at 1:38:43-1:39:57 PM; Amended Complaint, docket #18, p. 3, ¶ 14. *Cf.* Exhibit 7, p. 10 (email from Monday, July 10, 2017 at 10:59 AM: "Expecting the closing on Wednesday and meet you in person on Wednesday, too!").
[27] *See generally* December 2 Hearing Recording at 10:07:23-10:31:56 AM.
[28] *See generally* December 1 Hearing Recording at 2:54:31-3:11:13 PM.
[29] *Id.* at 4:25:59-4:26:24 PM.
[30] *Id.* at 2:56:10-2:57:00 PM and 3:04:08-3:05:15 PM.

already had money himself.[31]  Enya testified that she relied on either Allen or a dictionary if she

had difficulty understanding the documents that she eventually signed, and Allen testified that

"we" consulted with other non-attorney members of the LDS Church.[32]  Enya also dismissed the

idea of discussing the documents with Danny by saying "he's not American either, so why I

should ask him?"[33]  Enya claimed to have understood the risks of a house-flipping venture but

also seemed to believe that the Personal Guarantee would mitigate or entirely negate those risks,

even in the event of bankruptcy.[34]  And both Allen and Enya became irritated with lines of

questioning about the details of the Phoenix and Raleigh investment packages, the parties'

negotiations, the executed documents, and the projects' progress, repeatedly emphasizing that

their only role in the process was to give Danny money to help acquire the properties and then

receive their money back with profit within 90 days.  The Court will not further belabor the

point, but the trial record is replete with testimony from the Lins along these lines.[35]

For his part, Danny testified at length regarding both his due diligence before the

properties were purchased and how they went from being purchased in July/August 2017 to

being foreclosed in November/December 2018, and his version of events went largely

unchallenged.[36]  In Danny's telling, the problems with the Raleigh property began at closing

when the primary hard money lender, First Rehab Lending, unexpectedly requested three months

of mortgage payments up front, which did not leave enough money for his chosen contractor to

---

[31] December 2 Hearing Recording at 11:15:00-11:15:29 AM.

[32] *Id.* at 11:38:00-11:38:28 AM and December 1 Hearing Recording at 4:23:42-4:24:48 PM.

[33] December 2 Hearing Recording at 11:38:28-11:38:45 AM.

[34] *Id.* at 11:27:13-11:32:22 AM.

[35] Allen also confirmed that Danny kept in regular contact with the Lins regarding the projects for some period of time, although there was some dispute about the nature, content, and value of those communications.  *See, e.g.*, December 1 Hearing Recording at 3:50:47-3:51:30 PM and 4:00:33-4:01:34 PM.  And Danny testified several times that the Lins were not interested in discussing essentially anything substantive about the projects other than when they would get their money back.  *See, e.g.*, *id.* at 11:52:59-11:53:48 AM and December 2 Hearing Recording at 3:08:13-3:09:08 PM.

[36] *See generally* December 2 Hearing Recording at 1:42:30-2:26:41 PM.

immediately begin the rehabilitation of the property. He then caused 1034 Dixie, LLC—the actual legal entity owned by Flip2Freedom rather than the identically named joint venture—to solicit an additional investment from Blue Mountain Assets to fund the rehabilitation which started at the end of September 2017, but weather issues, substantial change orders that required additional permits, progress requirements of the rehabilitation funding, and the inability to obtain more funding from First Rehab Lending in late 2017 eventually caused all construction to stop in January 2018 with the rehabilitation only 55% to 60% completed.[37] Meanwhile, the plans for the Phoenix rehabilitation expanded over time but never got off the ground even though Danny considered the project the "best deal" he had seen in his brief house-flipping career. Despite Danny's prodding and payments to his chosen architect, the necessary permits were not obtained until December 2017, by which time his chosen contractor was no longer available to do the job and an alternate contractor would only start the work if it received a $100,000 down payment.

But still, Enya ostensibly takes issue with the accuracy of Danny's representations at the time of the deals regarding the projects' timelines and finances and being cut out of the loop thereafter, his purported use of joint venture money to pay for personal expenses, and his subsequent attempts to extricate himself from the quicksand as the projects faltered, particularly with respect to the Phoenix property. And to be sure, the financial history of especially the Phoenix project remains relatively opaque and raises legitimate questions about Danny's representations and management of the joint ventures. For starters, Danny was initially relying on an agreement with Union of Credit—which he described as an association of members with various roles in the real estate industry—to fund both the purchase and rehabilitation of the Phoenix property until it "fell out five days before the closing," which led to extensive

---

[37] *See* FN 43 *infra.*

discussions about the meaning of the phrase "fell out."[38]   The Phoenix property investment package also says under the "Already in Place" heading that "[w]e are already approved by Union of Credit for 100/100 loans,"[39] which means that Union of Credit would fund 100% of both the purchase price and the rehabilitation, but that is both internally inconsistent and facially nonsensical; if that kind of funding were already in place, Danny's entity 4020 Colter, LLC would not have needed any additional funding from outside sources.[40]

Ultimately, Danny's entity used money from Sound Capital, LLC, Mark Simpson, and Enya to purchase the Phoenix property,[41] and Danny credibly if confusingly testified about when and on what terms he considered the Union of Credit deal to be officially "dead."  Specifically, he began discussions with Union of Credit in May 2017 regarding the purchase and rehabilitation of the Phoenix property and thought he had a funding commitment through that cooperative to fund the purchase, but they were ultimately unable to fund the purchase within the anticipated short window before closing.   However, they also told him that they would "help [him] refinance" the property after it was purchased, and he continued to negotiate with them on that issue—and perhaps the rehabilitation funding issue—until everything fully collapsed in September/October 2017.[42]   And as for the Raleigh property, First Rehab Lending had only

---

[38] December 1 Hearing Recording at 12:25:13-12:26:21 PM.  The quoted statement is also confusing because the Raleigh and Phoenix transactions did not close until July 25 and August 4, 2017, respectively, and further because of whether Danny was seeking funding for the Raleigh or Phoenix project in his July 6, 2017 Facebook post.
[39] Exhibit 1, p. 3.
[40] *See id.* at pp. 6-7 (showing gap funds needed to purchase Phoenix property based on a 90% LTV hard money loan) and Exhibit 2, pp. 2 and 5-6 (showing internally consistent 90% LTV hard money loan to purchase Raleigh property).
[41] December 2 Hearing Recording at 3:38:53-3:39:17 PM.  It is unclear how Sound Capital, LLC became the primary hard money lender on the Phoenix property.
[42] *See generally* December 1 Hearing Recording at 12:14:52-12:26:27 PM.

loaned approximately $390,000 for the purchase price rather than the full $1 million line of credit touted by Danny in a July 8, 2017 email.[43]

So by October 2017, construction on the Raleigh property had just haltingly begun and would soon end, nothing substantive had happened with the Phoenix property while it remained in permit purgatory, and the Promissory Notes to Enya were already due. The details of Danny's next steps are spotty, but the gist is that Danny solicited other investors and got involved in even more flipping projects in a doomed attempt to salvage his sinking ship. Stewart Pope loaned $238,000 in late November 2017 that was eventually directed to a number of Flip2Freedom projects—including another property that was eventually purchased using the 4020 Colter, LLC entity while it still owned the original Phoenix property—and some of that money was apparently used to partially repay Enya.[44] According to Danny's testimony and the Pachecos' Schedule E/F, Karen Foutz loaned somewhere between $100,000 and $200,000 in late December 2017 that was also directed to a number of Flip2Freedom projects.[45] And First Property Investments, Inc. loaned at least another $40,000 in mid-2018 that was intended to cover the $8,800/month mortgage payments on the Phoenix property and forestall foreclosure.[46] Most bizarrely, Danny caused approximately $50,000 to $75,000 to be sent to someone called John Paul between approximately October/November 2017 and November 2018—sometimes in the

---

[43] Exhibit 7, pp. 2-4. The email contains an itemization of Danny's basis for asserting that he can pay the expected return within three months, and the Speculator Approval letter from First Rehab Lending is part of that proof. The Court notes that although the total line of credit is $1 million, the "per property" loan amount is only $100,000-$400,000, which is consistent with Danny's inability to get additional funding from First Rehab Lending on the Raleigh property in late 2017 after it had already loaned approximately $390,000 for the purchase price. The letter says "80% Acquisition / 100% Rehab," which appears to be inconsistent with the 90/100 indication in Exhibit 2. And the letter also says "3 Months Reserves," which may relate to the requirement for three months of mortgage payments that allegedly surprised Danny at the Raleigh property closing. None of these issues was discussed at trial.

[44] *See generally* December 1 Hearing Recording at 2:15:02-2:46:50 PM and December 2 Hearing Recording at 3:33:51-3:40:02 PM; *see also* Amended Complaint, docket #18, p. 7, ¶ 52.

[45] *See generally* December 2 Hearing Recording at 3:33:51-3:40:02 PM; *see also* Exhibit 9, p. 37 of 79, Schedule E/F #4.72.

[46] *See, e.g.*, December 1 Hearing Recording at 11:52:59-11:53:15 AM.

form of gift cards—in an attempt to obtain a loan of up to $2.5 million that would pay off all

obligations to everyone and save all of his entities' properties. This was a successful scam, and

no loan of any amount was ever obtained from Mr. Paul.[47]

The details of the Pacheco, Flip2Freedom, and LLC money flows are equally spotty, in

large part because the 4020 Colter, LLC entity did not have its own U.S. Bank account(s) until

June 2018, and the 1034 Dixie, LLC entity never had its own account. In the meantime, all

money flowed through Flip2Freedom's Wells Fargo account, which was closed with a negative

balance and alleged third-party fraudulent activity in May 2018.[48] The Wells Fargo statements

for Flip2Freedom show regular transfers to Pacheco K Custom Management, which Danny

ultimately and unhelpfully confirmed was "a fund for [him] and [his] wife to receive monies."[49]

The U.S. Bank statements for the 4020 Colter, LLC entity show purchases in late 2018 and early

2019 from Amazon, Walmart, Redbox, 7-Eleven, and the like as well as other more sizeable

transfers.[50] And while Mr. Pope testified that Danny told him around February 2018 that he had

taken a $30,000 "salary," Danny testified that he took no such salary.[51]

In the end, Danny caused Enya to be repaid $39,000 from one or more sources between

approximately October 2017 and January 2018,[52] and then both of the Lins sued the 4020 Colter,

LLC entity and Danny personally in February 2018, which resulted in default judgments being

entered against both defendants.[53] Danny caused Mr. Pope to be repaid nearly $50,000 from one

---

[47] *See, e.g.*, *id.* at 12:57:50-1:00:15 PM and December 2 Hearing Recording at 3:42:52-3:44:01 PM.

[48] *See, e.g.*, December 2 Hearing Recording at 2:27:02-2:32:55 PM and 2:57:42-2:58:40 PM.

[49] *Id.* at 2:58:41-2:59:31 PM and Exhibit 12.

[50] Exhibit 11 (statements found at end of document).

[51] December 1 Hearing Recording at 2:22:42-2:22:56 PM; December 2 Hearing Recording at 2:40:01-2:40:14 PM and 3:29:11-3:29:33 PM.

[52] Amended Complaint, docket #18, p. 7, ¶ 52.

[53] Exhibit 8. The default judgment obtained by both of the Lins against Danny personally was not technically contained within the "universe of exhibits" mentioned earlier (*see* FN 7 *supra*), and its existence has been yet another source of confusion dating back to the original Complaint and the January

or more sources,[54] and then Danny lost his Springville home in March 2019 when Mr. Pope

foreclosed on the lien that Danny had given him as security for his loans.[55]   The Phoenix and

Raleigh properties were lost to foreclosure in November and December 2018, respectively.[56]

Other Flip2Freedom projects between 2017 and 2019 allegedly collapsed.[57]   And as stated

earlier, the Pachecos filed for chapter 7 bankruptcy on April 10, 2019.

## II. DISCUSSION

### A.      § 523(a)(2)(A)

Enya's first claim for relief is based on § 523(a)(2)(A), which excepts from discharge any

debt "for money . . . to the extent obtained by false pretenses, a false representation, or actual

fraud, other than a statement respecting the debtor's or an insider's financial condition."   "In

order to establish a nondischargeable claim under [§ 523(a)(2)(A) based on false representation],

a creditor must prove the following elements by a preponderance of the evidence: [1] The debtor

made a false representation; [2] the debtor made the representation with the intent to deceive the

creditor; [3] the creditor relied on the representation; [4] the creditor's reliance was [justifiable];

and [5] the debtor's representation [proximately] caused the creditor to sustain a loss."[58]

"As to the second element of the § 523(a)(2)(A) test, intent to deceive need not be shown

by direct evidence but may be inferred from the totality of the circumstances and includes

---

23, 2020 hearing on the Pachecos' motion to dismiss.  *See, e.g.*, January 23, 2020 Hearing Recording at
2:47:38-2:48:08 PM.  But the Court received Exhibit 8 into evidence anyway because it had already been
discussed at the September 20, 2021 pretrial conference and did not prejudice Danny's defense to
nondischargeability.  There is also some indication that the Lins may have sued 1034 Dixie, LLC and
Danny with respect to the Raleigh property, but this was not developed at trial.  *See, e.g.*, Exhibit 9, pp.
66-67 of 79, Statement of Financial Affairs Q#9.
[54] December 1 Hearing Recording at 2:41:17-2:41:34 PM.
[55] *Id.* at 2:28:17-2:29:11 PM; Exhibit 9, p. 67 of 79, Statement of Financial Affairs Q#10.  Mr. Pope
testified that Dark Matter Freight was a logistics company that he owned with his brother.
[56] December 2 Hearing Recording at 1:36:50-1:37:50 PM.
[57] December 1 Hearing Recording at 4:31:40-4:32:00 PM.
[58] *Ward v. Pewtress (In re Pewtress)*, Adv. No. 09-2491, 2010 WL 5108732, at *3 (Bankr. D. Utah Dec.
9, 2010) (*quoting In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009)) (quotations and citations omitted).

reckless disregard of the truth.  That said, the mere inability or failure to perform is not, in itself, sufficient evidence of fraudulent intent.  As to the third and fourth elements, the justifiable reliance standard is not reasonableness in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations.  Rather, the inquiry is whether the actual creditor's reliance was justifiable from a subjective standpoint.  In determining whether a creditor's reliance was justifiable, a court should therefore examine the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases.  Even under the justifiable test, however, the plaintiff must use his senses and at least make a cursory examination or investigation of the facts of the transaction before entering into it.  Moreover, this test does not leave objective reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the objectively reasonable, the greater the doubt about reliance in fact.  In effect, reasonableness goes to the probability of actual reliance."[59]

"And although § 523(a)(2)(A) generally requires false representations as to past or current facts rather than promises related to future actions, a debtor's misrepresentation of his intentions may constitute a false representation within the meaning of [§ 523(a)(2)(A)] if when the representation was made the debtor had no intention of performing as promised.  To qualify as an affirmation of fact, a statement must be objective in nature, i.e., verifiable or capable of being proven true or false.  Similarly, to be relied upon as a promise, a statement must be highly specific or definite."[60]  Mere boasting or puffery does not suffice.[61]

---

[59] *Pewtress*, 2010 WL 5108732, at *4 (quotations and citations omitted).
[60] *Id.* (quotations and citations omitted).
[61] *See, e.g.*, *Phoenix Equity Ventures, LLC v. Baillio (In re Baillio)*, Adv. No. 08-1124 S, 2010 WL 3782065, at *12 n.23 (Bankr. D.N.M. Sept. 21, 2010); *Boud v. SDNCO, Inc.*, 54 P.3d 1131, 1135 (Utah 2002) (describing puffery).

The Court finds that Enya has not met her burden to demonstrate a false representation claim under § 523(a)(2)(A). For starters, it remains unclear whether Danny even made a qualifying false representation. During his interactions with the Lins, he was a member of the LDS Church in good standing, he accurately represented his two prior successful flips in Maryland, and the Phoenix and Raleigh properties were purchased as contemplated by ¶ 6.a.i. of the JVAs—funded in part by Enya's direct wire transfers to the respective closing agents. The purchase prices were in line with what was advertised, there was no evidence that the proposed rehabilitation budgets were inaccurate when presented in the investment packages, the investment packages accurately represented that only the realtors were in place as opposed to the contractors and others, and significant rehabilitation of the Raleigh property did occur.

Although it was not explicitly framed this way at trial, it is clear that substantial confusion resulted from the unincorporated joint ventures being given the same names as Danny's own legal entities—4020 Colter, LLC and 1034 Dixie, LLC. As such, it appears that there was substantial compliance with at least the letter of the JVAs. For example, Danny and/or his entities did borrow additional money from outside sources at various times, but borrowing by his entity 4020 Colter, LLC is distinct from borrowing by its joint venture with Enya—and there is no evidence of any borrowing by the joint venture. Additional joint venture agreements were apparently executed with other parties, but nobody else was admitted as a venturer into these specific JVAs. None of the joint ventures' money was commingled with other funds because Enya's loans were immediately used to purchase the properties, and there were no proceeds from the ventures to account for or segregate. And the properties were never sold, assigned, or refinanced.

To be sure, First Rehab Lending did not ultimately lend $1 million, but it did lend $390,000 for the purchase of the Raleigh property. The joint ventures did not have their own bank accounts despite ¶ 18 of the JVAs, but the ventures generated no money. The statement on page 3 of the Phoenix investment package regarding approval by Union of Credit for "100/100 loans" is facially inaccurate, or there would have been no need for gap funding in the first place; it is also simultaneously contradicted by pages 6 and 7 of the same document as well as Danny's email from July 8, 2017 at 2:00 PM.[62] Union of Credit did not provide funds to purchase or refinance the Phoenix property, but Sound Capital did, and Danny testified that his dealings with Union of Credit were not officially dead until September/October 2017. Danny testified that the sale in 60 days discussed in Option #2 of the Phoenix investment package meant 60 days after the property was rehabilitated, which is consistent with the rest of the document and with the overall project. And while Danny testified at one point in his deposition that he originally expected it to take six and nine months for the Raleigh and Phoenix properties to be "rehabilitated," respectively, he testified at trial that he probably meant to say "flipped," which is consistent with other parts of his deposition, the timeframe differential for the successful Maryland projects, and the proposals in the Phoenix and Raleigh investment packages. He also testified that his initial six-to-nine-month gap funding request was based on worst-case scenario projections and that he had other funding sources as backup even if the rehabilitation or flipping was not completed by the time that Enya's Promissory Notes came due, which is consistent with items 1.1 and 1.2 in the July 8 email regarding his ability to repay—neither of which have anything to do with payment from the proceeds of successful rehabilitations and flips.[63]

---

[62] Exhibit 7, p. 2.
[63] *Id.* The Court also notes that the Phoenix investment package projected a June 30 closing date and October 30 rehabilitation completion date, while the Raleigh investment package projected a July 14

But even if Danny did make a false representation, the Court finds that Enya has failed to demonstrate either actual or justifiable reliance for the reasons discussed earlier in pages 7 and 8. Allen initiated contact with Danny, and Danny's original discussion was with Allen, while the extent of Enya's involvement in the early negotiations remains unclear. The Lins are clearly intelligent and have post-secondary degrees, but this was their first real estate investment in the United States, and yet Enya wired $100,000 within 96 hours of Allen's first contact with Danny. The Lins had no real understanding of real estate investing or the poorly constructed documents that Allen modified and Enya signed. Enya eschewed consulting Danny about the documents, instead relying solely on Allen, a dictionary, or other members of the LDS Church. It was the Lins who treated themselves as a fungible unit and decided at the last minute to switch the counterparty on the JVAs and the Promissory Notes from Allen to Enya. And the Lins were only concerned with getting their money within 90 days, without any real interest in or understanding of how that would occur.

And finally, even if Danny made a false representation upon which Enya actually and justifiably relied, the Court finds that Enya has failed to demonstrate that Danny made any such representation with the requisite intent. Danny was certainly in a hurry to get $100,000 on July 6, 2017, but the preponderance of the evidence does not show that he impermissibly cut corners in obtaining it; rather, the evidence shows that Danny was in a liminal space between two successful flips in Maryland and a long, desperate scramble to save his failing business. In July 2017, he legitimately believed that he would be able to repay Enya, at least from other funding sources if not from the rehabilitations and flips themselves. As both projects faltered, he dug deeper and deeper holes, and in the process he did real financial harm to both himself and

---

closing date and an August 23 rehabilitation completion date. Both of the closing dates had already passed by the time that Enya wired money on July 10 and July 25.

others—but from whatever source, he did cause Enya to be repaid $39,000. Someone later in the spiraling chain of events, such as Stewart Pope or Karen Foutz, may have had a more solid claim for nondischargeability under § 523(a)(2)(A), but the Court cannot find that Enya has demonstrated Danny's intent to deceive during the relevant time of their interactions.

While the amended complaint limited the § 523(a)(2)(A) claim to false representation, and the Court reviewed the elements of that specific claim at the start of trial with no response from Enya's counsel, he also asserted false pretenses and actual fraud in both his opening statement and closing argument. "False pretenses under [§] 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. False pretenses can be defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."[64]  In turn, "[a]ctual fraud occurs when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right."[65]  No motion has been made under Federal Rule of Civil Procedure 15(b)(2) to conform the pleadings to the evidence, but the Court would reject those alternate theories in any event for the reasons already discussed. Just as the evidence fails to support the elements of false representation, the evidence also fails to show material omissions or a course of conduct by Danny that wrongfully induced Enya to lend his entities $185,000. And while a claim for actual fraud requires neither inducement nor reliance, it does require some intentional design to deprive or cheat, which again does not exist by a preponderance of the evidence on this record.

---

[64] *Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013) (quotations and citations omitted).
[65] *Id.* (quotations and citations omitted); *see also Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 10 (10th Cir. BAP 2016).

Accordingly, Enya's claim under § 523(a)(2)(A) will be DISMISSED.[66]

**B.    § 523(a)(4)**

The remaining embezzlement claim under § 523(a)(4) can be disposed in relatively short order.  "For purposes of § 523(a)(4), embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. The elements required to prove embezzlement are: (1) entrustment, (2) of property (3) of another (4) that is misappropriated (used or consumed for a purpose other than for which it was entrusted), (5) with fraudulent intent.  The fraudulent intent required for embezzlement is not identical to the type required for actual fraud or fraudulent misrepresentation under § 523(a)(2). Rather, embezzlement requires *animus furandi* or intention to steal.  In addition, embezzlement requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud."[67]

The main reason that the embezzlement claim must fail is that Enya wired the money directly to the closing agents to assist Danny's entities with purchasing the Phoenix and Raleigh properties, and the funds were actually used for that intended purpose.  There are interesting questions to be asked about the creation and use of the Flip2Freedom and 4020 Colter, LLC bank accounts—particularly for subsequent lenders and investors—but Enya only nibbled around the edges of those issues at trial, and the money entering and leaving those accounts was not Enya's or the joint ventures' property in any event.  Danny also caused $39,000 to be paid to Enya from some source.  And for essentially the same reasons already discussed, the Court cannot find on this record that Danny possessed the requisite "intention to steal" Enya's money.

---

[66] And to be clear, the result would be the same as to both of the Lins if Allen had not been voluntarily dismissed as a co-plaintiff on January 24, 2020.

[67] *Ingram v. Nelson (In re Nelson)*, Adv. No. 13-2478, 2014 WL 1347031, at *4 (Bankr. D. Utah Apr. 4, 2014).

While the amended complaint switched the original complaint's § 523(a)(4) claim from fraud or defalcation while acting in a fiduciary capacity to embezzlement, and the Court reviewed the elements of that specific claim at the start of trial with no response from Enya's counsel, he also raised the issue of fiduciary duty in both his opening statement and closing argument. As with the § 523(a)(2)(A) claim, no motion has been made under Federal Rule of Civil Procedure 15(b)(2) to conform the pleadings to the evidence, but again the Court would reject that alternate theory. "For a fiduciary relationship to exist under § 523(a)(4), as the Tenth Circuit explained in *Fowler Brothers v. Young (In re Young)*, there must be an express or technical trust. The existence of such a fiduciary relationship is determined under federal law, although state law is relevant to the inquiry. The provision does not usually apply to ordinary commercial relationships."[68] "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability. Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy."[69] Here, Enya has pointed to no express or technical trust that would satisfy the requirements of the Bankruptcy Code, nor has she argued that Arizona or North Carolina law would compel a different result. No trust *res* has been defined. And she wired the first $100,000 well before executing any of the documents with Danny's entities.

Accordingly, Enya's claim under § 523(a)(4) will also be DISMISSED.[70]

---

[68] *Barenberg v. Burton (In re Burton)*, 463 B.R. 142, at *5 (10th Cir. BAP 2010) (table); *see also Holaday v. Seay (In re Seay)*, 215 B.R. 780 (10th Cir. BAP 1997).

[69] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1372 (10th Cir. 1996) (quotations and citations omitted).

[70] And again, the result would be the same as to both of the Lins if Allen had not been voluntarily dismissed as a co-plaintiff on January 24, 2020.

C.      **Attorney's Fees and Costs / § 523(d)**

Finally, Danny has indicated several times throughout this adversary proceeding that he would be seeking attorney's fees and costs for having to defend this action, but the Court finds no basis for such an award.  Section 523(d) does not apply because the debt at issue is business debt rather than consumer debt, and the claims were "substantially justified" even though they failed at trial.  Utah Code § 78B-5-826 involves reciprocal fees in one-sided contracts and ¶ 24 of the JVAs provides for fees, but this is not an action on the contracts.  Federal Rule of Bankruptcy Procedure 9011 and Utah Code § 78B-5-825 involve sanctions and fees for frivolous and bad faith actions, but this adversary proceeding survived two motions to dismiss, and the evidence at trial did not demonstrate frivolousness or bad faith.  And neither § 105 nor general equitable and common law principles are sufficient to overcome the American Rule, even in bankruptcy court.

The request is DENIED, and each party shall bear his or her own attorney's fees and costs.

### III. CONCLUSION

Flipping houses is a risky endeavor, and unfortunately both Enya and Danny have suffered severe consequences from their joint ventures.  Enya lost a substantial amount of money on her first real estate investment in the United States and has spent nearly four years pressing her claims, sometimes on her own behalf.  Danny lost his house and his business and has spent at least two and a half years defending against Enya's claims.  In his opening statement and closing argument, Danny's counsel repeated the refrain that Danny did "nothing wrong," but that is an overstatement of the evidence, and today's decision should not be taken as total absolution for a perfect set of business dealings.  Rather, it should be taken for what it is—Enya's failure at trial to prove her claims for nondischargeability under § 523(a)(2)(A) and (a)(4) by a preponderance

of the evidence.  Accordingly, for the reasons discussed above, this adversary proceeding will be

DISMISSED WITH PREJUDICE.  A separate judgment will be issued in accordance with this

Memorandum Decision.

-------------------------------------------END OF DOCUMENT---------------------------------------------

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.


Yaping Lin
8203 West Oraibi Drive, Apt. 2085
Peoria, AZ  85382
 *Plaintiff*

Jeffrey L. Kitchen
651 W. 1140 N.
Orem, UT  84057
 *Counsel for Plaintiff*

Chad Rasmussen
Alpina Legal
2230 N. University Pkwy., Ste. 7E
Provo, UT  84604
 *Co-Counsel for Plaintiff*

Danny Zuriel Pacheco
3018 Zachary's Keep Ct.
Winston-Salem, NC  27103
 *Defendant*

Jory L. Trease
140 West 2100 South, Suite 212
Salt Lake City, UT  84115
 *Counsel for Defendant*